UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph R. CARNEIRO, Terry L. Johnson, George L. Ennis, Larry Emerson, Thomas Francis Begley, Willie Williams, Thomas J. Boyd, Defendants–Appellants.

Nos. 87–3134 to 87–3137, 87–3139, 87–3141 and 87–3142.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1988.

Decided Nov. 22, 1988.

Phillip J. Wetzel, Perrizo and Wetzel, Spokane, Wash., for defendant-appellant, Carneiro.

Leslie R. Weatherhead, Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for defendant-appellant, Emerson.

Robert H. Whaley, Carl E. Hueber, Winston & Cashatt, Spokane, Wash., for defendant-appellant, Thomas J. Boyd.

Jeffry K. Finer and Patrick K. Stiley, Stiley & Associates, Spokane, Wash., for defendant-appellant, Begley.

Jeffrey Steinborn, Seattle, Wash., for defendant-appellant, Ennis.

Robert Henderson, Henderson & Nichols, Spokane, Wash., for defendant-appellant, Johnson.

Lewis M. Wilson, Spokane, Wash., for defendant-appellant, Williams.

James R. Shively, Asst. U.S. Atty., Spokane, Wash., for plaintiff-appellee.

Before SCHROEDER, ALARCON and NORRIS, Circuit Judges.

ALARCON, Circuit Judge:

In this criminal action the seven appellants entered conditional guilty pleas to narcotics offenses. They appeal from the denial of their motions to suppress incrimi-

nating evidence obtained by the Drug Enforcement Administration (DEA) through the use of four judicially approved wiretaps. The wiretaps were issued by a district court judge under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1982 & Supp. II 1984). The appellants argue that the four wiretaps were invalid because they failed to satisfy statutory and constitutional requirements. We affirm in part, reverse in part, and remand.

## I

## BACKGROUND

On June 25, 1985, Patrick Fazio contacted DEA Agents Williams and Sanchez in Spokane, Washington. Fazio claimed to have connections with numerous cocaine and marijuana dealers in eastern Washington and offered to sell information about these individuals to the DEA. At the time that he volunteered to sell the information, Fazio was not a suspect nor a target of investigation in any crime.

Fazio identified a Spokane drug dealing ring involving Thomas Boyd, Ray Harty, and numerous other participants. However, at the time that Fazio identified the ring, he was not sufficiently familiar with the suspects to arrange a controlled purchase.[1] Nevertheless, he agreed to help the DEA in other drug cases. Eventually, with Fazio's assistance, the DEA was able to infiltrate the Boyd–Harty drug ring through a series of five controlled drug purchases.

### A. *First Purchase*

On July 29, 1985, Fazio told the DEA that he had information that William Weeks was involved in a local cocaine distribution ring. Fazio arranged to meet Weeks on July 30, 1985 to purchase cocaine. On that day, Weeks took Fazio to the home of Shari Jackson where Fazio bought two grams of cocaine for $200. Weeks told Fazio that his partner, Cara Cunningham, lived at that address. Weeks also stated that (1) his source of cocaine had been in business for 40 years, (2) his source's drugs came from Amsterdam, and (3) the drug inventory was not kept at the source's home. Before he left, Fazio arranged to buy one ounce of cocaine from Weeks on Friday, August 2, 1985. Weeks then made a telephone call to his drug source to verify Fazio's one ounce order. During that call, Weeks asked the source to return his telephone call on August 2, 1985.

### B. *Second Purchase*

On August 2, 1985, the DEA installed a trap and trace device on Shari Jackson's telephone line.[2] That afternoon, the trap and trace device recorded an incoming call from Charles McNeil's residence. Later that afternoon at a local hotel, Fazio introduced undercover DEA Agent Mary McElderry to Weeks as a cocaine purchaser. Agent McElderry then took Fazio and Weeks to a room at the hotel to discuss the one ounce cocaine purchase. Shortly thereafter, Weeks and Fazio left the hotel room and Cara Cunningham entered to deliver the cocaine to Agent McElderry. Weeks then reentered the room, discussed further purchases with McElderry, and then departed with Cara.

### C. *Third Purchase*

On August 29, 1985, the DEA began surveillance of Charles McNeil, whom the DEA suspected was Weeks' source of drugs.[3] The DEA agents observed McNeil and his companion, Trena Dent, follow Weeks to and from a meeting with McElderry. Agent McElderry and Fazio met with Weeks at a restaurant to purchase

---

1. A controlled purchase is one made under the authority and supervision of law enforcement officers.

2. The trap and trace device records the originating telephone numbers of incoming telephone calls. Another device, called a pen register, records the telephone numbers dialed from a telephone.

3. During August 1985, an associate of Karl Klauder, a suspected drug dealer, told Agent Sanchez that Klauder was also selling cocaine for Charles McNeil.

one ounce of cocaine. During the sale, Weeks identified his four Spokane drug retailers as: Sandy Long, Tammy Browning, Angie (last name unknown), and Cara Cunningham.

### D. *Fourth Purchase*

On September 28, 1985, Agent McElderry again met with Weeks at a hotel to purchase one and a half ounces of cocaine. Before this transaction, DEA agents observed Weeks and McNeil meet at Weeks's home and then depart for the hotel in separate cars. McNeil waited in his car outside the hotel while Weeks went in to sell the cocaine to McElderry. At one point during the sale, Weeks told Agent McElderry that he had to leave temporarily to "pay his man." Weeks then went to McNeil's car, returned to McElderry, and sold her an additional two grams of cocaine. After Weeks left his car, McNeil drove to the home of suspected drug dealer Ray Harty.[4]

### E. *Fifth Purchase*

On November 7, 1985, Agent McElderry met with Weeks to purchase three more ounces of cocaine. Before this meeting, DEA agents observed McNeil and Dent meet with Weeks at Shari Jackson's house. Shortly thereafter, McNeil and Dent left the Jackson residence and returned to their house where they immediately placed a call to Ray Harty's residence.[5] Meanwhile, Weeks executed the sale of cocaine to Agent McElderry. During the course of the sale, Weeks told McElderry that he had just met with his source of cocaine.

### F. *The Wiretaps*

After the five controlled purchases were made, Agent Sanchez learned that Spokane police officers, working undercover, had purchased cocaine from Shari Jackson on November 12 and 16, 1985. During the November 16 sale, Jackson told the undercover Spokane officer that "Bill" was her source of cocaine. Agent Sanchez believed that "Bill" was William Weeks. Agent Sanchez also learned that Spokane police had purchased cocaine from Karl Klauder on November 26, 1985.[6]

On January 8, 1986, Agent McElderry called Weeks, asked about buying six ounces of cocaine, and requested a meeting with Weeks' source. Weeks told her that she could not meet his source and that, in any case, the source was always close by when Weeks sold cocaine and Weeks would give the purchase money to the source immediately after a cocaine sale. On the same date, the DEA began to monitor McNeil's telephone with a pen register. From January 8 to January 10, the pen register recorded that McNeil placed approximately fifty telephone calls to suspected drug dealers, including: Weeks, Klauder, and Harty.

On January 10, 1986, Weeks called Agent McElderry in Seattle and quoted her a price for six ounces of cocaine. Weeks also told McElderry that his source of cocaine did not want to meet anyone new and that he (Weeks) had paid $5000 to meet the source.

On January 21, 1986, the government, using an affidavit executed by Agent Sanchez, applied for permission to wiretap McNeil's telephone. The government had not previously applied for a wiretap in any case in the Eastern District of Washington.[7] On January 21, 1986, the district court authorized a wiretap of McNeil's telephone. McNeil's telephone lines were tapped from January 21 until February 5, 1986.

---

**4.** Following this fourth purchase, on October 17, 1985, the DEA installed a pen register on McNeil's home telephone line. The register showed frequent telephone calls from McNeil's residence to those of reputed drug dealers, including Ray Harty.

**5.** From October 17, 1985 to November 14, 1985, the DEA's pen register noted that McNeil called telephone numbers belonging to persons suspected of involvement in drug trafficking. These people included: Ray Harty, William

Weeks, Karl Klauder, Sandra Long, Michael Thompson, and Gerald Quinnett.

**6.** An informant had earlier told Agent Sanchez that Klauder was selling cocaine for Charles McNeil.

**7.** A draft of Agent Sanchez's affidavit was sent to the Justice Department in Washington D.C. for review before it was filed.

On February 10, 1986, the government applied for permission to wiretap Ray Harty's telephone. The application was granted. Harty's telephone lines were tapped from February 11, 1986 to March 6, 1986. During this wiretap, the DEA determined that Thomas Boyd was Harty's supplier.

On March 27, 1986, the government applied for permission to wiretap Thomas Boyd's telephone. The district court authorized a wiretap. Boyd's telephone lines were tapped from March 27 until April 24, 1986. A pen register was then installed on Boyd's telephone line and operated from April 26 to April 29, 1986. On April 29, 1986, the government applied for an extension of the Boyd wiretap. The extension was granted. Boyd's telephone lines were tapped from April 29, 1986 to May 7, 1986.

## II

## PROCEDURAL HISTORY

Relying on evidence obtained from the wiretaps, a federal grand jury returned a superseding indictment against 29 persons, including six of the seven appellants in this appeal.[8] A separate 13 count superseding indictment was filed against Thomas Begley, the seventh appellant in this appeal, and five other persons. The indictments charged each defendant with conspiracy, possession, and distribution of a controlled substance. The indictments also charged some of the defendants with unlawfully using a telephone to facilitate a drug conspiracy and with being felons in possession of firearms. The defendants pleaded not guilty to the charges against them.

On November 6, 1986, the defendants filed motions to suppress all evidence obtained as a result of the four wiretaps.[9] From January 26 to January 29, 1987, the district court held a hearing on the motions to suppress. On January 29, 1987, the

district court denied the motions.[10] On March 18, 1987, the defendants jointly filed motions for reconsideration. On September 17, 1987, the district court denied the motions for reconsideration.

Beginning on March 3, 1987, the appellants entered conditional guilty pleas to the various counts against them, while reserving the right to appeal from the district court's ruling on their motions to suppress. The appellants timely appealed. We consolidated their appeals.

## III

## ISSUES ON APPEAL

The appellants argue that the district court erred by denying their motions to suppress because (1) the government's applications for the wiretaps failed to make the statutorily required showing of necessity and (2) the wiretap orders were impermissibly broad. In addition, appellant Emerson contends that the incriminating wiretap evidence against him should be suppressed because it was obtained after the goals of the wiretap were achieved.

## IV

## DISCUSSION

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1982 & Supp. II 1984), permits law enforcement officials to engage in electronic surveillance if certain safeguards are observed. Congress enacted Title III to meet the procedural restrictions imposed on the use of electronic surveillance by the Supreme Court's decisions in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967). *Scott v. United States*, 436 U.S. 128, 130, 98 S.Ct. 1717, 1719, 56 L.Ed.

---

**8.** This indictment was 66 pages long and contained 134 counts.

**9.** The defendants' motions were deemed jointly filed because, on June 11, 1986, the district court had ordered that all pretrial motions "shall be construed as filed in all cases [by all defendants] unless the defendant wishing to opt

out of the motion files with the Clerk a statement indicating such intention ..."

**10.** The district court did not make any written findings. Instead, it made its findings orally at the end of the suppression hearing. However, the court ordered a formal order denying the defendants' motions to suppress.

2d 168 (1978). The purpose of the Act is to "provide law enforcement officials with some of the tools thought necessary to combat crime without unnecessarily infringing upon the right of individual privacy." *Id.; see also United States v. Kalustian,* 529 F.2d 585, 588 (9th Cir.1975) (describing dual purpose of wiretap statute).

To obtain a wiretap, a law enforcement official must apply to a judge for an order permitting the surveillance. 18 U.S.C. § 2518(1). The application must include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). In addition, the statute expressly requires the district court to determine whether the wiretap application contains facts to support a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). A district court must reject a wiretap application if law enforcement officers have not first attempted, without success, traditional investigative methods that "easily suggest themselves and are potentially productive and not unduly dangerous." *United States v. Ippolito,* 774 F.2d 1482, 1486 (9th Cir.1985). Taken together, §§ 2518(1)(c) and (3)(c) require a showing of necessity before a district court can issue a wiretap order. *Id.* at 1485. The purpose of the necessity requirement is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

■ In addition to determining whether the statutory requirements were met, a district court reviewing the validity of a wiretap order must examine the application to see if it contained material misstatements or omissions regarding the necessity of the wiretap. *See Ippolito,* 774 F.2d at

1485–86. If an application is inaccurate, the reviewing court must determine the true facts and rely on the credible evidence produced at the suppression hearing to determine whether "a reasonable district court judge could have denied the application because necessity for the wiretap had not been shown." *Id.* at 1486–87; *cf. United States v. Simpson,* 813 F.2d 1462, 1472 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987).

■ On an appeal from the denial of a motion to suppress, we review the record and make an independent determination whether a wiretap application contains a full and complete statement of the facts necessary to satisfy the requirements of 18 U.S.C. § 2518(1)(c). *United States v. Brone,* 792 F.2d 1504, 1506 (9th Cir.1986). We review the issuing judge's necessity determination under 18 U.S.C. § 2518(3)(c), however, for an abuse of discretion. *Id.* at 1506. Underlying factual findings of the district court, concerning misleading statements and omissions, are reviewed under the clearly erroneous standard. *Simpson,* 813 F.2d at 1472 n. 14.[11]

At the suppression hearing, the district court ruled that the applications for the wiretaps met the necessity requirement when examined together as a whole. The district court did not, however, examine whether the various wiretap applications, when considered separately, contained inaccuracies that rendered any of the wiretaps unnecessary and invalid under the *Ippolito* test.

■ The district court erred in failing to examine each wiretap application separately. *Each* wiretap application, standing alone, must satisfy the necessity requirement. *Brone,* 792 F.2d at 1507; *United States v. Santora,* 600 F.2d 1317, 1321 (9th Cir.1979) (same), *amended on other grounds,* 609 F.2d 433 (9th Cir.1979); *See United States v. Abascal,* 564 F.2d 821, 826 (9th Cir.1977) (the government must do more than show that the telephone subscribers they wish to tap are all part of one

---

**11.** The only credibility finding the court made was in regard to Agent Sanchez's statements in the McNeil wiretap application.

conspiracy), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978). In *Brone* we stated: "The government may not dispense with the statutory mandated showing of necessity to obtain a wiretap [of one conspirator's] telephone despite the validity of the wiretap of his co-conspirator's telephone." 792 F.2d at 1507.

Our review of each wiretap independently of the others indicates that the McNeil wiretap satisfies the necessity requirement and is free from material omissions or misstatements. However, the three subsequent wiretaps, the Harty wiretap, the Boyd wiretap, and Boyd wiretap extension do not contain sufficient facts to satisfy the necessity requirement. In addition, the applications contain misstatements and omissions regarding the necessity for the wiretaps.

### A. *The McNeil Wiretap*

█ The McNeil wiretap application satisfied 18 U.S.C. § 2518(1)(c) because it contains a full and complete statement of the facts which support a necessity determination. Agent Sanchez's affidavit adequately demonstrated that the McNeil wiretap was necessary because (1) normal investigative techniques had been unsuccessful in identifying McNeil's cocaine source or the scope of his drug operation and (2) other untried traditional investigative methods were unlikely to further the investigation.

Agent Sanchez alleged that physical surveillance of McNeil had proved unsuccessful because the DEA could not establish which of the persons contacted by McNeil was his cocaine source. Agent Sanchez also stated that DEA Agent McElderry could not adequately infiltrate the drug ring because Weeks refused to introduce her to his source. In addition, the affidavit set forth facts showing that examination of McNeil's telephone records and the use of a pen register on his telephone line did not reveal the contents of the telephone conversations or establish the identity of the persons called. Agent Sanchez also alleged that DEA informant Fazio did not know McNeil's source. Finally, Agent Sanchez's affidavit stated that the DEA had elected

not to use other techniques such as an investigative grand jury or grants of immunity because such actions would reveal the DEA's investigation to McNeil but probably would not result in the identification of McNeil's cocaine source.

Agent Sanchez's affidavit gave a full and complete statement of the type of facts necessary to establish the necessity for a wiretap of McNeil's telephone line. The district court did not abuse its discretion by issuing the wiretap order. *See United States v. Brown,* 761 F.2d 1272, 1276 (9th Cir.1985) (affidavit demonstrated necessity because it described the inadequacies of physical surveillance, infiltration by agents, examination of telephone records, and interviews); *United States v. Kail,* 612 F.2d 443, 447 (9th Cir.1979) (affidavit adequately demonstrated necessity because it provided sufficient particularized detail to demonstrate the need for a wiretap in spite of some success with normal investigative techniques), *cert. denied,* 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980).

Appellants contend that some of the statements in the affidavit were unsupported conclusions. For example, although Agent Sanchez stated that to his knowledge "Neither the DEA nor any other police agency has an informant who could penetrate this operation," he fails to describe which, if any, other agencies he had asked for assistance. While it is true that some of the statements in the affidavit are mere conclusions, the facts set forth in the affidavit meet the necessity requirement when examined as a whole and in a common sense fashion. *See Brone,* 792 F.2d at 1506 (affidavit met necessity requirement when examined as a whole even though it made "somewhat conclusory statements about the difficulties of prosecuting the case").

Appellants also assert that the district court abused its discretion under 18 U.S.C. § 2518(3)(c) by finding that the wiretap was necessary. They argue that the DEA failed to exhaust normal investigative techniques before seeking the wiretap. *See Ippolito,* 774 F.2d at 1486 (the government must attempt to use productive and cost

effective investigative methods before seeking a wiretap order). Appellants allege that the DEA (1) did not aggressively pursue interviews with persons associated with the drug ring, (2) did not place a pen register on Harty's telephone before January 21, 1986, (3) did not establish stationary surveillance of Harty's home until late in the investigation, (4) did not adequately review a parallel local city investigation of the McNeil drug ring, and (5) did not conduct an adequate investigation of the drug ring from November 7, 1985 until mid-January 1986.

Appellants contentions are not persuasive. They merely suggest, with the benefit of hindsight, alternative ways that the DEA could have pursued its investigation. The investigative methods used by the DEA were potentially productive. The fact that the DEA could have taken different or some additional steps in its investigation does not demonstrate that the district court abused its discretion in upholding the wiretap order. *See United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985) (the necessity requirement is not intended to limit the use of a wiretap to a last resort investigative tool); *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.1984) (courts will not invalidate a wiretap order because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir.1977) (the necessity requirement does not require law enforcement officers to exhaust all possible uses of ordinary investigative techniques); *United States v. Pezzino*, 535 F.2d 483, 484 (9th Cir.1976) (per curiam) (the necessity requirement can be satisfied even though the police failed to use one type of normal investigative technique), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 106 (1976).

Moreover, the evidence shows that the DEA adequately exhausted productive investigative techniques before resorting to the wiretap. The DEA used informants, surveillance, pen registers, and undercover agents to discover that McNeil was Weeks's cocaine source. The DEA sought permission to use a wiretap only when those methods of investigation proved ineffective in revealing McNeil's source and the scope of his drug operation.

Appellants also contend that the affidavit contained material omissions and misstatements which, if revealed to the issuing court, would have demonstrated that the wiretap of McNeil's telephone was unnecessary. Appellants argue that the affidavit failed to reveal that the DEA knew that Harty was McNeil's cocaine source before applying for the McNeil wiretap. There is no evidence in the record to support this assertion. Although the DEA was aware that McNeil was in contact with various reputed drug dealers, including Harty, there is no evidence in the record that, at the time Agent Sanchez applied for the McNeil wiretap, the DEA knew that Harty was McNeil's supplier and not simply a lower level member of the drug ring. Furthermore, Agent Sanchez's affidavit revealed to the district court the fact that the DEA was aware that McNeil was in contact with various drug dealers. Appellants also assert that Agent Sanchez failed to tell the court in his affidavit that he discouraged Spokane police from pursuing their own investigation of the drug ring, presumably to avoid jeopardizing his wiretap application. There is no evidence in the record that Agent Sanchez ever attempted to hinder the city's investigation to better his chances of obtaining a wiretap order.

Appellants also challenge the McNeil wiretap as being overbroad. We make a non-deferential, independent determination whether a wiretap order is unconstitutionally overbroad. *Cf. United States v. McClintock*, 748 F.2d 1278, 1282 (9th Cir. 1984) the constitutionality of a search warrant challenged for failing to particularly describe items to be seized is reviewed *de novo, cert. denied*, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985). Appellants argue that the McNeil order was overbroad because it permitted the DEA to use the wiretap to discover the details of the drug operation, such as the manner of the cocaine distributions and the dates, times,

and places of specific drug transactions. Appellants contend that to be consistent with the fourth amendment, the DEA was entitled to use the wiretap solely for the purpose of discovering the identities of the various drug suppliers.

The fourth amendment requires that the government show that it has probable cause to believe that a specific crime has been or is being committed before it may invade constitutionally protected areas. *United States v. Licavoli*, 604 F.2d 613, 620 (9th Cir.1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). The fourth amendment's particularity requirement is satisfied if a wiretap order identifies (1) the telephone line to be tapped and (2) the particular conversations to be seized. *Id.*

Title III requires that wiretap orders "contain a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c) (1982). We have held that a wiretap order satisfies Title III's particularity requirement if it recites "the elements of the statutory offense to which the communications sought to be intercepted would relate." *Licavoli*, 604 F.2d at 620.

The wiretap order satisfied the particularity requirements of the fourth amendment and Title III. The wiretap order identified the telephone line to be tapped and specifically identified the offenses that the DEA was investigating. The order states that McNeil and others are suspected of (a) the distribution of controlled substances and possession with the intent to distribute controlled substances, (b) use of a communication device to facilitate those crimes, and (c) conspiracy to commit those offenses in violation of 18 U.S.C. §§ 841(a)(1), 843(b), and 846. Finally, the order only authorized the DEA to intercept those conversations relating to the commission of the designated offenses.

Once a wiretap order complies with the requirements of the fourth amendment and Title III, it may be formulated in a manner "'broad enough to allow interception of *any* statements concerning a specified pattern of crime.'" *Licavoli*, 604 F.2d at 620 (emphasis added) (quoting *United States v. Tortorello*, 480 F.2d 764, 780 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973)). Accordingly, the issuing court's order properly allowed the DEA to use the wiretap to intercept *any* conversation relating to the suspected controlled substance offenses and to discover the details of McNeil's operation.

In addition to the appellants' general contention, appellant Emerson argues that the incriminating wiretap evidence against him should be suppressed because it relates to his participation in marijuana transactions rather than the cocaine ring under investigation. The DEA discovered this evidence during the McNeil wiretap.

Emerson's argument is unpersuasive. The McNeil wiretap order was formulated to allow the DEA to intercept communications relating to transactions involving any controlled substance. The wiretap order stated that the DEA was entitled to intercept any conversation relating to designated "controlled substance" offenses. The DEA requested the wiretap, in part, to identify the scope of the drug ring's operation. The order did not limit the DEA to gathering evidence of cocaine transactions. Therefore, the DEA was entitled to intercept communications involving marijuana transactions associated with appellants' criminal activities involving controlled substances. *See Licavoli*, 604 F.2d at 620 (wiretap order was worded broadly enough to permit FBI to intercept communication relating to stolen painting even though, initially, the defendant was only suspected of stealing diamonds).

Emerson also contends that the evidence concerning his transaction relating to marijuana should be suppressed because it was collected *after* the DEA had accomplished the goal of the McNeil wiretap, discovery of McNeil's source.[12]

Title III requires that wiretaps terminate automatically "upon attainment of the au-

**12.** Emerson properly raised this issue before the district court.

thorized objective." 18 U.S.C. § 2518(5) (1982). Evidence obtained *after* a wiretap's objective is met must be suppressed under 18 U.S.C. §§ 2515 and 2518(10)(a)(i), (iii). Here, however, the incriminating evidence against Emerson was not discovered after the goals of the McNeil wiretap were achieved.

Contrary to Emerson's assertion, the goal of the McNeil wiretap was not simply to discover McNeil's cocaine source. Rather, the wiretap also authorized the DEA to discover the scope and details of the alleged conspiracy's entire operation. This goal was not achieved during the McNeil wiretap. In fact, the DEA's investigation of the scope of the alleged conspirator's activities involving controlled substances continued through the succeeding Harty and Boyd wiretaps. Accordingly, the evidence of Emerson's activities involving marijuana should not be suppressed because it was discovered before the goals of the McNeil wiretap were achieved. *See United States v. McCoy*, 539 F.2d 1050, 1056 (5th Cir.1976) (wiretap evidence did not need to be suppressed because it was discovered before the wiretap's goal was achieved), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); *United States v. Turner*, 528 F.2d 143, 158 (9th Cir.) (per curiam) (goal of wiretap was to discover the details of a drug operation and this goal was not yet achieved when incriminating evidence was discovered), *cert. denied*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975).

### B. *The Harty Wiretap*

 The Harty wiretap application did not satisfy the necessity requirement because it contained material omissions and misstatements. If these omissions and misstatements had been revealed in the application, "a reasonable district court judge could have denied the application because necessity for the wiretap order had not been shown." *Ippolito*, 774 F.2d at

1487; *see also United States v. Simpson*, 813 F.2d at 1472.

The principal defect with the affidavit is that it failed to tell the issuing court that the DEA did not conduct a traditional investigation of Harty's criminal activities before applying for the wiretap on his telephone line. The DEA applied for the Harty wiretap on February 11, 1986, six days after terminating the McNeil wiretap. The purpose of the wiretap was to (1) identify Harty's cocaine source and (2) discover the scope of the drug operation. There is no indication in the application that the DEA attempted an investigation of Harty to discover this information before applying for the wiretap. The only efforts to investigate Harty by traditional law enforcement techniques occurred *after* the wiretap was installed on his telephone. Moreover, Agent Sanchez's supporting affidavit appears to be a word processor copy of the allegations he set forth in the McNeil wiretap application. In fact, at one point the Harty affidavit mistakenly uses McNeil's name instead of Harty's.[13]

More importantly, the facts alleged in the affidavit could mislead the issuing judge into believing that the DEA had utilized traditional methods of investigation before seeking the Harty wiretap. Agent Sanchez's affidavit states that the government elected not to subpoena McNeil during its investigation because he would not have any information about Harty's cocaine source. In its brief before this court, the government admits that "[i]t is true that Sanchez' statement, that McNeil did not know Harty's source, has little support in the record." The affidavit also states that physical surveillance of the Harty residence is "extremely difficult" because it is partially fenced off and is located on an unimproved street away from any major traffic. However, the affidavit fails to mention that the DEA never actually attempted to explore the possibility of physical surveillance until after the wiretap or-

---

**13.** The affidavit states that Agent Sanchez has failed to find any "direct link between Charles McNeil and the persons supplying him with

cocaine." The government admits that Agent Sanchez erred and should have used Harty's name in this part of the affidavit.

der was issued.[14] The affidavit also states that "[t]here are no known informants who have purchased illegal drugs from HARTY ... there are no informants to make an introduction." This statement implied that the DEA had actually searched for informants before making the application when, in fact, the record indicates that the DEA did not do so.

If these omissions and misstatements had been revealed, a reasonable district court judge could have denied the wiretap request because the errors show that the DEA failed to pursue traditional methods of investigation before seeking the wiretap.

The government claimed in its application that the wiretap was necessary because traditional investigative techniques had failed to reveal Harty's cocaine source or the scope of his illegal operation. If the government failed to employ productive investigative methods to discover this information, it did not satisfy the necessity requirement. The fact that the government adequately exhausted traditional investigative techniques before seeking an order to tap McNeil's telephone is irrelevant.

As noted above, the necessity requirement does not compel law enforcement agents to use wiretaps only as a last resort. However, a wiretap cannot be the initial step in a criminal investigation. *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1834, 40 L.Ed.2d 341 (1974); *Brone,* 792 F.2d at 1506. Before using a wiretap, the agents must, at the very least, use traditional investigative methods that "easily suggest themselves and are potentially productive and not unduly dangerous." *Ippolito,* 774 F.2d at 1486.

The DEA failed to conduct an investigation of Harty prior to applying for authority to tap his telephone. Instead, it appears that the DEA sought the wiretap simply because Harty was believed to be a member of the conspiracy under investigation. A suspicion that a person is a member of a conspiracy, however, is not a sufficient reason to obtain a wiretap. *Abascal,* 564 F.2d

at 826 (the government must do more than show that the telephone subscribers they wish to tap are all part of one conspiracy), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978); *see also Brone,* 792 F.2d at 1507 (the government may not dispense with the necessity showing with regard to one conspirator simply because it has proved necessity in the case of another); *Santora,* 600 F.2d at 1321 (same). Rather, the government must satisfy the necessity requirement every time that it seeks a wiretap. *Abascal,* 564 F.2d at 826 (government must show that each wiretap separately satisfies the necessity requirement).

### C. *The Boyd Wiretap*

The Boyd wiretap, when examined on its own merits, also fails to satisfy the necessity requirement. Agent Sanchez's affidavit in support of the Boyd wiretap contains material omissions and misstatements. If these defects had been revealed, a reasonable district court judge could have denied the wiretap application for lack of necessity. *See Ippolito,* 774 F.2d at 1487.

As in the case of the Harty application, Agent Sanchez's affidavit fails to disclose that the DEA did not conduct an investigation before seeking an order to tap Boyd's telephone. The government acknowledges that the DEA's surveillance of Boyd had been very limited when the wiretap application was made. The purpose of the Boyd wiretap was to (1) identify Boyd's cocaine source and (2) determine the scope of his drug operation. However, the record does not indicate that the DEA made any effort to acquire this information using traditional investigative techniques.

The government argues that it complied with the necessity requirement because it had been investigating the drug ring since July 1985. However, this fact, although supported by the record, does not meet the requirements of the law. The government's earlier investigations of Weeks, McNeil, and Harty are irrelevant to the

---

**14.** After the wiretap was installed, the DEA installed a camera next to Harty's house and filmed the arrival and departure of various defendants.

question of whether the government adequately investigated Boyd to identify *his* cocaine source and the scope of *his* drug operation before resorting to electronic surveillance to acquire that information. As the government recognizes in its brief, "there must be a showing of necessity with respect to each telephone and conspirator." *Brone,* 792 F.2d at 1507; *Santora,* 600 F.2d at 1321 (9th Cir.1979); *Abascal,* 564 F.2d at 826. In this case, the government failed to investigate Boyd before seeking the wiretap on his telephone. Moreover, the application was misleading. Agent Sanchez's affidavit in support of the Boyd wiretap informed the issuing judge that the wiretap was necessary because there was no indication that Boyd's cocaine source would visit him and that "[i]n fact, the information is to the contrary". The government now admits that this statement is "without evidentiary support". In addition, Agent Sanchez testified at the suppression hearing that this statement was merely carried over from previous wiretap applications.

The affidavit also stated that the DEA had interviewed Boyd's associates and had examined Boyd's telephone records. The government states in its brief that the statement regarding the interviews is correct because the DEA interviewed Fazio. However, in another part of its brief, the government also states that Fazio "could not buy from Boyd, never had bought from him, and was not part of any drug distribution network." There is also no evidence that the DEA ever reviewed Boyd's telephone records. At the suppression hearing, Agent Sanchez testified that there were no DEA records confirming such an examination.

The affidavit also stated that surveillance of Boyd's house was not practical. The government now admits that surveillance was never attempted before the wiretap. Moreover, *after* the wiretap was authorized, the DEA agents were able to observe Boyd's house from a trailer so well that they could determine which television

programs his family was watching. The affidavit informed the issuing judge that Agent Sanchez "through surveillance and other investigative methods, has failed to reveal any direct link between Thomas J. Boyd and persons supplying him with cocaine". This statement went to the heart of the rationale for the Boyd wiretap. Yet, the record indicates that this statement was merely carried over from prior wiretap applications and that there was no investigation of Boyd before the wiretap. The government acknowledges that "it is correct to state that the surveillance of Boyd had been very limited when the application for authorization to monitor his telephone was made...." [15]

The Boyd wiretap order is invalid because it contains material omissions and misstatements that concealed the fact that the wiretap was not necessary which if revealed, could have compelled a reasonable district court judge to deny the request.

### D. *The Boyd Wiretap Extension*

■ The Boyd wiretap terminated on April 24, 1986. Five days later, on April 29, 1986, the government applied for an extension of the wiretap. The extension request was based on evidence derived from the original wiretap order which we have concluded was improperly issued. Therefore, the Boyd wiretap extension is also invalid. The evidence derived from it must be suppressed.

The Boyd wiretap extension was invalid because Agent Sanchez's affidavit in support of the Boyd wiretap extension contains material misstatements and omissions about the necessity of continuing the wiretap. *See* 18 U.S.C. § 2518(5) (1982) (making the necessity requirement applicable to wiretap extensions); *United States v. Giordano,* 416 U.S. 505, 530, 94 S.Ct. 1820, 1834, 40 L.Ed.2d 341 (1974) (same). The application and Sanchez's supporting affidavit failed to inform the issuing judge

---

**15.** The government attempts to defend the statement by pointing to the investigation done in the earlier wiretaps. However, it does not explain how those investigations were relevant to the goals of the Boyd wiretap.

that the DEA did not conduct a conventional investigation of Boyd before seeking the wiretap extension.[16] Instead the affidavit repeats the statements of necessity set forth in the McNeil, Harty, and original Boyd wiretap applications.

Many of the statements in the Boyd extension affidavit are untrue and could mislead an issuing judge into believing that the wiretap extension was necessary because of the failure of normal investigative techniques. For example, the affidavit states that Boyd's residence "is so situated that stationary surveillance is not practical." This statement is taken verbatim from the previous wiretap application. This statement fails to tell the issuing court that, after the original wiretap order was issued, DEA agents were able to monitor Boyd's house from a nearby trailer. The affidavit in support of the application for an extension also asserted that "it is your affiant's opinion that continued utilization of normal investigative techniques will not accomplish the goals of this investigation."[17] These allegations suggest that the DEA pursued normal investigative techniques before seeking the wiretap. However, the record indicates that the DEA did not conduct an investigation of Boyd before seeking the wiretap extension.

## V

### CONCLUSION

The district court did not abuse its discretion in determining that the government set forth sufficient facts to show necessity for the issuance of the McNeil wiretap order. The invalidity of the remaining orders does not demonstrate error in authorizing a tap of McNeil's telephone. The application for the McNeil wiretap was free from material omissions or misstatements and was not impermissibly overbroad. The evidence

obtained as a result of the McNeil wiretap is admissible.

The district court abused its discretion in concluding that necessity required issuance of the other wiretap orders. The government's applications for those wiretaps contained misstatements and omissions regarding the necessity for the wiretaps. If these errors had been corrected by the reviewing district court, the applications would have revealed that the orders were not justified because the DEA failed to use the productive, traditional methods of investigation before requesting authority to tap telephones. The record shows that the government simply submitted slightly altered versions of the McNeil wiretap affidavit to demonstrate that the additional wiretaps were necessary.

Because the Harty wiretap, the Boyd wiretap and the Boyd wiretap extension did not meet the necessity requirements, the evidence obtained from them is "fruit of the poisonous tree," and must be suppressed. *See* 18 U.S.C. § 2515 (1982) (codifying the "fruit of the poisonous tree" doctrine); *Spagnuolo*, 549 F.2d at 711–12 (subsequent wiretaps suppressed because they were the tainted product of an earlier invalid wiretap).

On remand the district shall determine which evidence was obtained as a result of the Harty wiretap, the Boyd wiretap, and the Boyd wiretap extension. The evidence from these wiretaps must be suppressed. AFFIRMED in part, REVERSED in part, and REMANDED.

---

16. The DEA did install a pen register on Boyd's telephone line on April 26, 1986, after the original Boyd wiretap ended. The pen register was used for four days, until April 29, 1986, when the Boyd wiretap was extended.

17. The purpose of the wiretap extension was never clearly stated. Agent Sanchez's affidavit

mentions that the goals of the extension are listed in paragraph 5(e) of his affidavit. However, the Boyd extension affidavit did not contain a paragraph 5(e). Agent Sanchez appears to have borrowed the phrase from previous applications which did contain a statement of the wiretap goals in paragraph 5(e).