**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Rodney BLACKMON, aka Seal
A, Defendant–Appellant.**

No. 99–50534.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 12, 2000

Filed Dec. 12, 2001

Richard M. Steingard; Los Angeles, California, for defendant-appellant Rodney Blackmon.

Michael Terrell, Assistant United States Attorney; Los Angeles, California, for plaintiff-appellee United States of America.

Before: B. FLETCHER, THOMAS, and WARDLAW, Circuit Judges.

Opinion by Judge Betty B. FLETCHER: Dissent by Judge WARDLAW

BETTY B. FLETCHER, Circuit Judge:

Defendant-appellant Blackmon was convicted of controlled substance-related offenses and sentenced to a 262–month term following a stipulated facts bench trial before the district court. Blackmon appeals his conviction and sentence and argues that the district court erred by (1) denying his motion to suppress wiretap evidence because the government's application for the wiretaps failed to make the statutorily required showing of necessity, or, in the alternative, (2) erred in denying a *Franks* evidentiary hearing. In addition, Blackmon argues that the district court abused its discretion in assessing a two-level aggravating role enhancement. We hold that the wiretap evidence should be suppressed because the wiretap application contained material misstatements and omissions, and because the application does not otherwise make a particularized showing of necessity.

## BACKGROUND

The indictment against Blackmon followed an FBI narcotics investigation that utilized many wiretaps and investigated a number of suspects. An initial wiretap was authorized on April 29, 1997 on a phone primarily used by Maurice Miller (hereinafter "Miller wiretap"), a suspected narcotics trafficker who resided in the Jordan Downs Housing Project (JDHP) in Los Angeles, California. Approximately six months prior to its application for the Miller wiretap, the FBI began an investigation of Miller employing several traditional investigative techniques, including: informants, controlled drug purchases, surveillance, and trap/trace and pen registers. The Miller wiretap produced evidence that resulted in charges against Miller and others. Three subsequent wiretaps, which the government called "spin-offs" of the initial Miller wiretap, were authorized on June 18, July 23, and August 15, 1997. The three subsequent wiretaps (hereinafter "Blackmon wiretap") involved telephones primarily used by the appellant-defendant, Rodney Blackmon, who also resided in the JDHP. The necessity section of the FBI application for the Blackmon wiretap is, with a few alterations, a duplicate of the Miller wiretap application. Other than trap and trace devices and pen registers, no further investigative efforts were attempted in between the application for the Miller wiretap and that for the Blackmon wiretap. The Blackmon wiretap produced substantial evidence implicating Blackmon in drug trafficking activity.

Blackmon and three co-defendants were charged in a three-count indictment with one count of conspiracy to distribute a controlled substance, pursuant to 21 U.S.C. § 846, and two counts of possession with intent to distribute cocaine, pursuant to 21 U.S.C. § 841. Prior to trial, Blackmon sought to suppress wiretap-related evidence, alleging that the wiretap application failed to satisfy the "necessity" requirement. In the alternative, the defendant moved for a hearing pursuant to *Franks v. Delaware*. The district court denied Blackmon's suppression and *Franks* hearing motions. Thereafter, the parties submitted written stipulated facts

that served as the sole evidence for a bench trial. The district court found the defendant guilty of the charges set forth in all three counts of the indictment. The court sentenced Blackmon to 262 months of incarceration, to be followed by a ten-year period of supervised release.

## STANDARD OF REVIEW

We review de novo whether a full and complete statement of the facts was submitted in compliance with 18 U.S.C. § 2518(1)(c). *United States v. Brone,* 792 F.2d 1504, 1506 (9th Cir.1986). If a full and complete statement was submitted, we review the issuing judge's decision that the wiretap was necessary for an abuse of discretion. *Id.* With respect to determinations made by the district court judge at the suppression hearing, we review underlying factual findings under the clearly erroneous standard. *United States v. Carneiro,* 861 F.2d 1171, 1176 (9th Cir.1988).

## ANALYSIS

Blackmon challenges the government's wiretap application for failing to comply with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(1)(c). As a general matter, Title III prohibits electronic surveillance by the federal government except under carefully defined circumstances. The procedural steps provided in the Act require "strict adherence." *United States v. Kalustian,* 529 F.2d 585, 588 (9th Cir. 1976) (citing *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)), and "utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III." *Id.* at 589.

The provision in issue is § 2518(1)(c). Dubbed the "necessity requirement," it mandates that each wiretap application include:

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

§ 2518(1)(c). The necessity requirement " 'exists in order to limit the use of wiretaps, which are highly intrusive.' " *United States v. Bennett,* 219 F.3d 1117, 1121 (9th Cir.2000) (quoting *United States v. Commito,* 918 F.2d 95, 98 (9th Cir.1990)). The statute requires that the issuing judge determine whether the wiretap application contains facts that support a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Taken together, §§ 2518(1)(c) and (3)(c) require a full and complete statement establishing necessity. The purpose of these requirements is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

Thus, we require a full and complete statement of specific allegations indicating why normal investigative procedures failed or would fail in the particular case. *See United States v. Ippolito,* 774 F.2d 1482, 1486 (9th Cir.1985). Beyond the specificity requirement, we have adopted a "common sense approach" in which the reviewing court uses a standard of reasonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to do so because of danger or low probability of success. *Id.*

In addition to assessing the application for an adequate showing of necessity, the suppression court must examine it to see whether it contains material misstatements or omissions regarding necessi-

ty. *Ippolito*, 774 F.2d at 1485–86. If an application contains inaccuracies or significant omissions, the court must determine the facts relying on credible evidence produced at the suppression hearing to determine whether a "reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown." *Id.* at 1486–87.

We conclude wiretap evidence against Blackmon derived from the wiretap should be suppressed for two interrelated reasons. First, the application, which is nearly a carbon copy of a previous application for a different suspect, contains material misstatements and omissions regarding the necessity for the wiretap. Second, purged of the material misstatements and omissions, the application contains only generalized statements that would be true of any narcotics investigation. It is bereft of specific facts necessary to satisfy the requirements of § 2518(1)(c).

## I. Material Misstatements and Omissions

 The necessity sections of the Miller and the Blackmon wiretap applications are nearly identical. Before seeking the wiretap against Blackmon, other than using trap and trace devices and pen registers, it appears that the government conducted no investigation targeted specifically at Blackmon. The "carbon copy" contains statements perhaps applicable to Miller, but not to Blackmon. As a result, discussion of physical surveillance and informants contains material omissions as applied to Blackmon.[1]

### A. Surveillance

The government's application claims that "on several occasions, law enforcement surveillance teams were compromised in an attempt to conduct surveillance operations on Blackmon and associates." This statement, which is copied from the Miller wiretap application except for the change of name, is untrue and could "mislead the issuing judge into believing that the [FBI] had utilized [surveillance as to Blackmon] before seeking the [Blackmon] wiretap." *See Carneiro*, 861 F.2d at 1180. The record is clear that no surveillance that the government attempted against Blackmon ever failed. This case is very similar factually to *Carneiro* where the court found the first wiretap order valid but subsequent ones tapping other suspects invalid because of failure to satisfy the showing of particularized investigative steps taken as to each and their failure. The *Carneiro* court held that the subsequent applications contained misstatements and omitted material information and reversed the district court's denial of suppression. *Id.* at 1180–81 ("The Harty wiretap application did not satisfy the necessity requirement because it contained material omissions and misstatements.... The principal defect with the affidavit is that it failed to tell the issuing court that the DEA did not conduct a traditional investigation of Harty's criminal activities before applying for the wiretap on his telephone line.").

 In support of its assertion that surveillance had been tried and failed, the

---

1. At the suppression hearing, the district court judge, who made no findings with respect to material omissions, stated that he "[didn't] see that there were deliberately false statements made or that they were made with reckless disregard for the truth." As discussed below, in light of *United States v. Carneiro*, 861 F.2d 1171 (9th Cir.1988), this was clear error.

wiretap application cites only one example of "almost compromised" surveillance that took place at the Jordan Downs Housing Project. This "almost compromised" surveillance took place eight months prior to the application for the Blackmon wiretap and it did not involve surveillance of Blackmon. Nevertheless, the government attempts to extrapolate from this remote event that the environment surrounding the JDHP would make surveillance attempted against Blackmon impracticable or dangerous. This extrapolation is impermissible for two reasons. First, the government is obligated under the strict confines of §§ 2518(1)(c) and (3)(c) to establish necessity every time it seeks a wiretap and "[t]he fact that the government adequately exhausted traditional investigative techniques before seeking an order to tap [the first suspect's] telephone is irrelevant." *Carneiro*, 861 F.2d. at 1180–81 (noting that a subsequent wiretap application appeared to be "a word processor copy of the allegations" set forth in an initial wiretap application for an alleged co-conspirator). It is inadequate to simply carry over statements from prior applications as to other suspects without making further investigative attempts. *Id.* at 1182. Second, the government's argument that we can extrapolate from this single example that surveillance against Blackmon would be unsuccessful or dangerous is belied by the record which shows that government informants had established observation posts within the JDHP and were providing agents with daily surveillance of the individuals entering Blackmon's apartment. We conclude that the surveillance section of the Blackmon wiretap application contained material misstatements and omissions that worked to conceal the fact that necessity had not been established.

### B. Informants

The section of the wiretap application discussing the usefulness of informants also contains material misstatements and omissions. The application states that the cooperating sources "only possess limited knowledge concerning the scope of the criminal enterprise." This statement is untrue, and the application omits the extent to which informants could have been successfully employed by the government in gathering evidence against Blackmon. For example, the cooperating informants available to the government had grown up in the JDHP and had known Blackmon for over ten years. The government concedes that one informant had special access to Blackmon and had in fact seen him "cooking" cocaine in his apartment. Furthermore, the informants knew the sources of the narcotics and the locations where the narcotics were stored and had participated in numerous controlled purchases of narcotics from Blackmon. The statement that informants had limited knowledge of Blackmon's criminal enterprise is untrue, and the application's necessity section omits discussion of the potentially successful use of informants. Like the discussion of surveillance, these misstatements and omissions work to "conceal[ ] the fact that the wiretap was not necessary." *Carneiro*, 861 F.2d at 1182.

■ Although we have found material misstatements and omissions in the portion of the necessity section discussing surveillance and informants, our inquiry is not complete. We must determine whether upon review of this application, purged of its misstatements, a reasonable issuing judge would find that the application nonetheless conforms to the requirements of §§ 2518(1)(c) and (3)(c). *Ippolito*, 774 F.2d at 1487 n. 3. We conclude that the purged affidavit, on its face, fails to meet the full and complete statement require-

ment of § 2518(1)(c) because it does not explain the specific circumstances rendering normal investigative techniques ineffective in this case.

## II. Full and Complete Statement of Necessity

 The purged application does not meet the full and complete statement requirement of § 2518(1)(c) because it makes only general allegations that would be true in most narcotics investigations. Further, the affidavit contains boilerplate conclusions that merely describe inherent limitations of normal investigative procedures.

The affidavit states a very generalized investigative purpose, which lays the framework for the government's claim of wiretap necessity:

> While [traditional] techniques are useful in establishing various aspects of the criminal enterprise, they have not been, and are not likely to be sufficient to produce the evidence necessary to identify *all the participants in this cocaine trafficking organization and to result in the successful prosecution of these individuals for their full involvement in this criminal enterprise.*

With this broad investigative backdrop, the affidavit sets the stage for discussing what traditional methods of investigation have failed or will fail or would be too dangerous. In discussing informants, the affidavit states that despite the successful employment of four informants during the Miller pre-wiretap investigation, these informants are insufficient to meet the broad investigative purpose here because they "typically only possess limited knowledge concerning the scope of the criminal enterprise." The affidavit further states that subjects like Blackmon "know that it is their best interest to reveal as little as possible to others concerning how their business is conducted ... Therefore, without the evidence sought by the application,

cooperating source information is insufficient to identify the entire criminal enterprise." These statements would be true of most or all drug conspiracy investigations, and the limitations on the usefulness of informants, no matter how successful or potentially successful to the particular operation, would support the necessity of a wiretap.

 With respect to pen registers, the wiretap application claims that these "records only provide evidence that the telephone was used, without showing the identity of the callers or the nature or purpose of those communications." But this is nothing more than a description of the inherent limitations of these devices. A full and complete statement of necessity must specify why, in the particular case at hand, these inherent limitations will be insufficient. As Blackmon argues, the record shows that pen registers did provide useful information in this case because they revealed numbers of individuals in contact with Blackmon who had previously been identified during the Miller wiretap.

Finally, the application discusses search warrants and witnesses. It justifies the lack of use of search warrants by stating that they "would be unlikely to produce evidence which would identify fully the other members of the organization, the organizational structure, the scope of the narcotics trafficking conspiracy, or the sources of supply." Witnesses were not used because "interviews of witnesses [would] not be successful in developing sufficient evidence to prosecute this entire organization." These boilerplate assertions are unsupported by specific facts relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations. This is simply not enough. *Kalustian,* 529 F.2d at 588–89 (suppressing wiretap evidence in a gambling investigation because the "affidavit does not enlighten us as to why this gam-

bling case presented any investigative problems which were distinguishable in nature or degree from any other gambling case").

As stated above, the government must strictly adhere to the requirements of § 2518. That pen registers do not reveal the identity of callers; that drug dealers know it is in their best interest to reveal as little as possible; that witnesses cannot lead to the prosecution of an entire drug organization; and that traditional investigative methods do not reveal all are generic problems of police investigation. Their generic nature does not dissipate simply because the government claims a vast investigative purpose. Wiretaps themselves could little achieve the investigative goals stated in the government's application. The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances. Doing so would render the requirements of § 2518 nullities.

## Conclusion

We hold that wiretap evidence against Blackmon should be suppressed because the government's wiretap application contains material omissions and misstatements. Purged of these misstatements, we find that the remainder of the application, which contains generalized statements that would be true of any narcotics investigation, fails to contain sufficiently specific facts to satisfy the requirements of § 2518(1)(c).

In light of this holding, we need not address the remainder of Blackmon's claims.

**REVERSED AND REMANDED.**

WARDLAW, Circuit Judge, dissenting:

I respectfully dissent. The majority's erroneous conclusion is predicated on its application of the *de novo* standard of review. This standard of review is dictated, the majority asserts, because the affidavit did not set forth a "full and complete statement as to whether or not other investigative procedures have been tried and failed," would not be likely to succeed, or are too dangerous. *See* 18 U.S.C. § 2518(1)(c). Yet each statement characterized by the majority as "untrue" is in fact neither false nor misleading. Both statements are well supported by the Blackmon application itself, as well as the remainder of the record. Moreover, the majority fails to identify any information regarding these statements that was actually withheld from the issuing court. Nearly every fact the majority cites as contradicting the Blackmon application was actually included in that application. Therefore, I conclude that the correct standard of review is for abuse of discretion, *United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir.2000) ("We review for abuse of discretion an issuing judge's decision that a wiretap was necessary."), and would hold that the issuing court (District Judge George King) did not abuse its discretion in granting the application for a wiretap. Nor did District Judge Rea err in denying the motion to suppress the evidence generated by the wiretap or in denying a *Franks* hearing.

The majority first concludes that the government's statement that "[o]n several occasions, law enforcement surveillance teams have been compromised in an attempt to conduct surveillance on Blackmon and associates" is false and misleading. The Blackmon affidavit, however, describes a specific example of such compromised surveillance. It states that an FBI surveillance van was compromised during a controlled purchase of cocaine from an associate of Blackmon's, Dwight Lee Palmer. Moreover, as the government stated during the suppression hearing, "there are other instances in which ... agents who approach the area are noticed, and have to leave right away." The fact that these "other instances" were not included in the

Blackmon affidavit does not make the "compromised surveillance" statement false.

The second statement that the majority identifies as false, that cooperating sources "only had limited knowledge concerning the scope of the criminal enterprise," is similarly supported by the record. The only evidence in the record that could contradict this statement is that one informant saw Blackmon "cooking up" cocaine and knew the location of some narcotics. This information, however, was disclosed to the district court in the Blackmon affidavit itself. And the fact that one informant saw Blackmon cook cocaine or knew the location of some narcotics does not mean that this informant had any more than "limited knowledge of the scope of the criminal enterprise."

Because the Blackmon affidavit does not contain the false or misleading statements that would trigger a *de novo* review, applying the correct standard of review, I would hold that the district court did not abuse its discretion in finding necessity for the Blackmon wiretap. In addition to providing a specific example of failed surveillance of Blackmon's associate, the Blackmon affidavit more than adequately demonstrates that traditional surveillance of Blackmon was extremely difficult, if not impossible. The affidavit notes that Blackmon's apartment was deep within the Jordan Downs Housing Project ("JDHP") and thus was essentially immune from FBI street-based surveillance. Similarly, the affidavit states that members of Blackmon's street gang used "lookouts," mostly younger gang members on bicycles using "walkie talkies," to alert drug dealers to the FBI's presence. Indeed, the affidavit even notes that an FBI van involved in a different drug investigation just outside the JDHP was approached by subjects of that investigation, who "shook and hit the van, and then threw objects at the van."

The Blackmon affidavit further describes the limitations of the government's four confidential informants. Although these informants provided the FBI with some useful information, the affidavit states that they did not have complete knowledge of Blackmon's "out-of-state customers, sources of supply, or how [he] dispose[s] of proceeds." We have consistently found that such limitations merit the granting of a wiretap. *See Bennett*, 219 F.3d at 1121 ("[Law enforcement officials] were unable, however, to obtain information about the extended organization, such as other members, couriers, buyers, and suppliers."); *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir.1990) (approving of affidavit that intended to "identify, investigate, and prosecute ... the sources of supply, co-distributors and major customers of [defendants'] cocaine distribution organization") (emphasis omitted).

The Blackmon affidavit also details the ineffectiveness of other investigative techniques. The affidavit reviews the information regarding Blackmon derived from wiretaps on other suspects and reaches the reasonable conclusion that those wiretaps would not produce sufficient evidence to incriminate Blackmon. It notes that search warrants and grand jury proceedings would simply alert Blackmon and his associates to the presence of an ongoing investigation, and thus would be unproductive. *See Torres*, 908 F.2d at 1422 (upholding necessity finding in part because "the use of a search warrant or grand jury proceeding would alert appellants of an ongoing investigation."). And, consistent with numerous of our decisions, the affidavit discusses the useful information that was obtained from pen registers, and then points out the technology's obvious limitations. *See Bennett*, 219 F.3d at 1121–22 ("[T]elephone records ... did not reveal the details of [the defendants'] transac-

tions."); *United States v. Brown,* 761 F.2d 1272, 1276 (9th Cir.1985) ("[T]elephone records, though raising suspicion that illegal activity was occurring, failed to identify specific users or reveal the substance of the conversations."); *United States v. Brone,* 792 F.2d 1504, 1506 (9th Cir.1986) ("[P]en registers and toll records did not disclose the nature of the business being transacted by telephone.").

In light of this detailed and accurate statement of necessity, our decision in *United States v. Carneiro,* 861 F.2d 1171 (9th Cir.1988), is distinguishable. In *Carneiro,* as here, the government incorporated verbatim portions of a previous wiretap application into application for wiretaps on several defendants. Although we found the duplicated wiretap applications to be insufficient, we did so because they "failed to tell the issuing court that the DEA did not conduct a traditional investigation of Harty's criminal activities before applying for the wiretap on his telephone line," and resulted in other misleading statements. *Id.* at 1180. As discussed, the *Blackmon* affidavit contained no false statements and the record overwhelmingly demonstrates that the government employed traditional investigative techniques—pen registers, informants, and surveillance—in its investigation of Blackmon. *Carneiro* is thus inapposite.

Because the Blackmon affidavit, in a full and complete statement, demonstrated that "ordinary investigative techniques employing a normal amount of resources have failed to make the case within a reasonable amount of time," *Bennett,* 219 F.3d at 1122, the district court did not abuse its discretion in finding necessity for the wiretap. Accordingly, I would affirm the district court.