**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ROBERT RODRIGUEZ,
*Defendant-Appellant*.

No. 15-50096

D.C. No.
3:13-cr-1128-BEN-3

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted December 9, 2016
Pasadena, California

Filed March 14, 2017

Before:  A. Wallace Tashima and Richard A. Paez, Circuit
Judges, and Paul L. Friedman,[*] District Judge.

Opinion by Judge Friedman

---

[*] The Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction on three drug-related charges, vacated the sentence, and remanded for resentencing.

The panel held that when considering a motion to suppress wiretap evidence, a reviewing district court judge should apply the Ninth Circuit's two-step approach: (1) review de novo whether the application for a wiretap contains a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or be too dangerous; and (2) if the application meets those requirements, review for abuse of discretion the issuing judge's conclusion that the wiretap was necessary. The panel held that the district court, which focused on the fact that other judges had reviewed the wiretap applications, erred by considering evidence beyond the statements in the supporting affidavits.

The panel held that the affidavits adequately explained why the interception of wire communications was necessary to investigate this conspiracy and the target subjects, and that they contained a full and complete statement of facts to establish necessity under 18 U.S.C. § 2518(1)(c). The panel held that the district court did not abuse its discretion in finding necessity.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court's application of 21 U.S.C. § 851 to enhance the defendant's sentence did not violate his Sixth Amendment rights. The panel held that the district court failed to comply with 21 U.S.C. § 851(b) when it did not ask the defendant if he affirmed or denied the prior convictions and did not inform him that he had to raise any challenge to a prior conviction before the sentence was imposed. The panel concluded that the error was not harmless. The panel wrote that two additional procedural defects warrant remand: the district court appears to have been uncertain of its responsibilities under § 851 as the sentencing hearing unfolded, and it is unclear whether the district court used the appropriate standard when ruling on the merits of the § 851 issues.

The panel held that the district court did not violate the defendant's constitutional rights by applying an upward adjustment under U.S.S.G. § 3B1.1 without submitting to a jury the issue of whether the defendant was a leader of criminal activity, nor clearly err in denying the defendant a downward adjustment under U.S.S.G. § 3E1.1(a) for acceptance of responsibility.

## COUNSEL

Jack J. Boltax (argued), Law Office of Jack J. Boltax, San Diego, California; Leif Harrison Kleven, Law Office of Leif Kleven, San Diego, California; for Defendant-Appellant.

Mark R. Rehe (argued), Assistant United States Attorney; Laura E. Duffy, United States Attorney; Peter Ko, Assistant United States Attorney, Chief, Appellate Section, Criminal Division; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**OPINION**

FRIEDMAN, District Judge:

Robert Rodriguez appeals from his conviction after a jury trial on three drug-related charges:  (1) conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846; (2) conspiracy to import methamphetamine, in violation of 21 U.S.C. § 952; and (3) distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and his sentence of 600 months in prison, followed by a lifetime of supervised release.  He argues that the district court erred because it applied the incorrect standard of review when deciding his motion to suppress and that the government's wiretap application did not include a full and complete statement of facts as required by 18 U.S.C. § 2518(1)(c).  Rodriguez also argues that the district court erred when it (1) enhanced Rodriguez's sentence under 21 U.S.C. § 851 after finding three prior convictions, (2) applied an organizer/leader upward adjustment under United States Sentencing Guidelines (U.S.S.G.) § 3B1.1, and (3) denied a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.  He also maintains that his sentence of 600 months is substantively unreasonable.

We have jurisdiction under 28 U.S.C. § 1291; we affirm Rodriguez's conviction, vacate his sentence, and remand for resentencing.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This case arises from an investigation in North San Diego County called "Operation Corridor," in which state and federal officers jointly investigated extortion and drug

trafficking by local street gangs and the Mexican Mafia, the largest prison gang in the United States. The Mexican Mafia is a violent organization that requires street gangs to pay "taxes" in the form of cash, drugs, or other property. If a gang pays the "tax," the Mexican Mafia will allow that gang to operate in and sell drugs in their neighborhoods. Those who do not pay taxes experience robbery and violence at the hands of Mexican Mafia members and its associates.

Rodriguez is a self-identified member of the Tri-City Thunder Hills Gang, which law enforcement officers believed was closely associated with and "answered to" the Mexican Mafia. Rodriguez also led a conspiracy involving the importation of methamphetamine from Mexico and its distribution in San Diego County and in South Carolina. Rodriguez's associates included, among others, his wife Carrie Brown-Rodriguez and his codefendant at trial, Travis Job. Rodriguez hired Job to "cut" methamphetamine, a process by which another product is added to pure methamphetamine to increase its weight and thus increase the quantity available for resale.

Seeking to gain more information about Rodriguez's operation and his association with the Mexican Mafia, law enforcement officers applied for authorization to wiretap Rodriguez's phone, along with the phones of three other individuals suspected of working with the Mexican Mafia or distributing drugs. Officer John McKean submitted a 43-page affidavit in support of his application for electronic surveillance. Law enforcement officers later submitted a second wiretap application, requesting wiretaps for two phone numbers listed to Carrie Brown-Rodriguez and used by Rodriguez. Officer McKean submitted a 40-page affidavit in support of the second application. The district court authorized both wiretaps. At the time the government

applied for these wiretaps, Rodriguez was subject to a Fourth Amendment search waiver as a condition of parole in an unrelated case. This fact was not included in either affidavit. The record does not contain the exact language of Rodriguez's Fourth Amendment search waiver.

A grand jury indicted Rodriguez on three counts: (1) conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846; (2) conspiracy to import methamphetamine, in violation of 21 U.S.C. § 952; and (3) distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Before trial, the government filed an information pursuant to 21 U.S.C. § 851 seeking enhanced penalties, including a 20-year mandatory minimum, because Rodriguez committed the offenses for which he was indicted after three prior felony convictions. Rodriguez filed a motion to suppress the wiretap evidence, which the district court denied following a suppression hearing. A jury convicted Rodriguez on all counts.

At sentencing, the district court calculated Rodriguez's guidelines sentencing range by applying a two-level increase to Rodriguez's base offense level for the importation of methamphetamine under U.S.S.G. § 2D1.1(b)(5), which Rodriguez does not contest, and a four-level upward adjustment based on the conclusion that he was the manager, leader, or recruiter of a criminal activity under U.S.S.G. § 3B1.1(a). The district court denied Rodriguez's request for a two-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. The court also concluded that Rodriguez was subject to a 20-year mandatory minimum under 21 U.S.C. § 851. After calculating a guidelines sentencing range of 360 months to life, the district court sentenced Rodriguez to 600 months in prison and supervised release for life.

## II.  WIRETAP AFFIDAVIT ISSUES

### A.  Standard of Review for Motions to Suppress Wiretap Evidence

Title III of the Omnibus Crime Control and Safe Streets Act allows law enforcement officers to use wiretapping in limited situations.  *See* 18 U.S.C. §§ 2510–2522.  "To obtain a wiretap, a law enforcement official must apply to a [U.S. District Court] judge for an order permitting the surveillance."  *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988) (citing 18 U.S.C. § 2518(1)).  Each wiretap application must meet several statutory requirements.  18 U.S.C. § 2518(1).  One of those requirements dictates that each application include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  § 2518(1)(c).  A law enforcement officer typically includes this statement of facts in a sworn affidavit in support of the wiretap application.  *See United States v. Christie*, 825 F.3d 1048, 1066 (9th Cir. 2016).  The issuing judge may conclude that the application satisfies the necessity requirement if he or she determines that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c); *see Christie*, 825 F.3d at 1066.  "Taken together, §§ 2518(1)(c) and (3)(c) require a showing of necessity before a district court can issue a wiretap order."  *Carneiro*, 861 F.2d at 1176.  The wiretap statute also includes its own exclusionary rule, requiring suppression of wiretap evidence that the government obtains in violation of Title III.  18 U.S.C. § 2515; *see United States v. Giordano*, 416 U.S. 505, 524–25 (1974).  A different district court judge must decide any

motion to suppress wiretap evidence, creating a second level of review in the district court.

On appeal, Rodriguez argues that the district court erred by deciding his motion to suppress under an abuse of discretion standard and improperly deferring to the issuing judge, rather than conducting its own independent review of whether the wiretap affidavits contained a full and complete statement of facts sufficient to satisfy 18 U.S.C. § 2518(1)(c).

### 1.  Proper Standard for District Court Considering a Motion to Suppress Wiretap Evidence

When we review a district court's decision on a motion to suppress wiretap evidence, we determine de novo whether the information in an affiant's application for a wiretap amounts to "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Christie*, 825 F.3d at 1066 (quoting 18 U.S.C. § 2518(1)(c)).  If the wiretap application meets the requirements of § 2518(1)(c), then the Court reviews for abuse of discretion the issuing court's finding that the wiretap was necessary under § 2518(3)(c) and its decision to grant the wiretap. *Id*.; *see also United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006) (en banc); *United States v. Canales Gomez*, 358 F.3d 1221, 1225 (9th Cir. 2004).  We, however, have not explicitly stated whether a district court must apply this same two-step approach when considering a motion to suppress wiretap evidence.  Some district court judges in the Ninth Circuit have reviewed wiretap orders issued by another district court judge solely under an abuse of discretion standard. *See, e.g.*, *United States v. Ai Le*, 255 F. Supp. 2d 1132, 1134 (E.D. Cal. 2003); *United States v. Sotelo*, No. 13cr4514-BEN, 2015 WL

468397, \*4 (S.D. Cal. Feb. 3, 2015). Other district court judges have adopted this Court's two-step approach when deciding a motion to suppress wiretap evidence. *See, e.g.*, *United States v. Alvarez*, No. 14-cr-00120-EMC-1, 2016 WL 69901, \*6–10 (N.D. Cal. Jan. 6, 2016); *United States v. Yim*, No. CR11-131MJP, 2012 WL 395791, \*5 (W.D. Wash. Feb. 7, 2012). The district court judge in this case applied only an abuse of discretion standard when he ruled on the motion at the suppression hearing.

We conclude that district courts should apply the Ninth Circuit's two-step approach when considering a motion to suppress wiretap evidence. Therefore, a reviewing district court judge must review de novo whether the application for a wiretap contains a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. *Christie*, 825 F.3d at 1066 (citing *United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008)). If the wiretap application meets these requirements of 18 U.S.C. § 2518(1)(c), then the district court judge should review for "abuse of discretion the issuing judge's conclusion that the wiretap was necessary." *Rivera*, 527 F.3d at 898 (citing *Lynch*, 437 F.3d at 912); *see also Christie*, 825 F.3d at 1066. In other words, the district court reviews de novo whether a full and complete statement of facts was submitted to the issuing judge under § 2518(1)(c), but "review[s] the issuing court's ultimate decision to authorize a wiretap [under § 2518(3)(c)] for an abuse of discretion." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111–12 (9th Cir. 2005); *see also Lynch*, 437 F.3d at 912.

A de novo review of whether the affidavit includes a full and complete statement of facts is critical at the motion to

suppress stage. A hearing on a motion to suppress is the first time when the necessity determination is reviewed in an adversarial proceeding, with defense counsel having his or her first opportunity to challenge the factual underpinnings of the issuing judge's finding of necessity and the steps law enforcement officers took or failed to take before seeking authorization for wiretapping. The reviewing district court judge sits in the best position for such a fact-intensive inquiry. This de novo review would also provide a fuller record for appellate review, where any factual findings would be reviewed for clear error. *Gonzalez, Inc.*, 412 F.3d at 1115. Our conclusion is also consistent with our precedent, approving of district court judges who conduct an independent review of whether wiretap affidavits satisfy 18 U.S.C. § 2518(1)(c). *See United States v. Reed*, 575 F.3d 900, 907 (9th Cir. 2009); *Carneiro*, 861 F.2d at 1176.

In this case, as we have noted, the district court judge applied an abuse of discretion standard to both determinations made by the issuing judge — whether the affidavit contained a full and complete statement of facts under 18 U.S.C. § 2518(1)(c), and the ultimate decision that it was necessary to authorize the wiretap under § 2518(3)(c). Although we conclude this was error, we need not reverse on this ground because we must do our own de novo review of the statement of facts under 18 U.S.C. § 2518(1)(c).

## 2. District Court's Review Limited to Information in the Affidavit

Before reviewing the affidavits, we address an additional problem with the way in which the district court applied the abuse of discretion standard in this case — considering evidence beyond the supporting affidavits. At the suppression hearing, the district court specifically noted that the two judges who approved the wiretap applications

involved in this investigation had "half a century of judicial experience between them," and that they had "reviewed hundreds of wiretap applications in their careers." In response to Rodriguez's request for an independent review of the affidavits, the district court stated that it could not ignore the fact that two other judges had reviewed the wiretap applications and that it could not look at the affidavits "with a fresh face as if, in fact, this was all in a vacuum." The district court cited no evidence from the affidavits themselves at the hearing. Instead, it focused on the fact that other judges had reviewed the wiretap applications and deferred to them. This was error.

When deciding a motion to suppress evidence, the district court must examine each wiretap application separately and may look only to information in the relevant affidavit to determine whether it contains a full and complete statement of facts under § 2518(1)(c). *See Carneiro*, 861 F.2d at 1176. "*Each* wiretap application, standing alone, must satisfy the necessity requirement." *Id.* (emphasis in original). On that basis, the reviewing judge must decide first whether the statement of facts in each affidavit was sufficient under § 2518(1)(c), and then whether the issuing judge abused her discretion in finding necessity and issuing the wiretap order.[1]

---

[1] This rule applies unless the defendant alleges that the wiretap application contains material misstatements or inaccuracies. As noted in our prior opinions, "[i]f an application contains inaccuracies or significant omissions, the court must determine the facts relying on credible evidence produced at the suppression hearing to determine whether a 'reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown.'" *United States v. Blackmon*, 273 F.3d 1204, 1209 (9th Cir. 2001) (citing *United States*

Although we conclude that the district court judge impermissibly reviewed the wiretap orders under only an abuse of discretion standard and considered evidence beyond the statements in the affidavits, we decline to remand the case in order to have the district court conduct a de novo review of the statement of facts set forth in the affidavits. Because we must conduct that same inquiry on appeal, a remand to the district court would be superfluous.

## B. General Challenges to the Wiretap Affidavits

Before turning to our de novo review of each wiretap affidavit, we first consider two general arguments that Rodriguez makes regarding the necessity requirement itself. First, Rodriguez argues that there was insufficient evidence in the affidavits of particularized necessity, that is, necessity with respect to him alone. He contends that any affidavit must show particularized necessity as to him and that any statements pertaining to the Mexican Mafia, other members of the conspiracy, or the conspiracy in general cannot be used to establish necessity for the wiretap.

We have said that an affidavit must include "specific facts relevant to the particular circumstances" of the case and not just boilerplate conclusions. *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001). Under this reasoning, statements pertaining to the conspiracy in general can be used to show why an investigative technique would be too dangerous or unproductive in regard to all of the target subjects listed in a single wiretap application, so long as they are supported by facts specific to the case. While the "the

*v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985)); *see also Carneiro*, 861 F.2d at 1176. Here, Rodriguez only alleged that the facts submitted in the affidavit did not establish necessity under 18 U.S.C. § 2518(1)(c).

government is not free to transfer a statutory showing of necessity from one [wiretap] application to another — even within the same investigation," that is not what happened here. *Gonzalez, Inc.*, 412 F.3d at 1115. Officer McKean appropriately explained in the affidavits why certain techniques would be unproductive or too dangerous in regard to all of the target subjects, including Rodriguez, due to alleged associations with the Mexican Mafia. That is sufficient under our precedent.

In further support for this conclusion, we note that "[i]nvestigations of criminal conspiracies present unique law enforcement problems and pose a greater threat to society than individual action toward the same end." *Canales Gomez*, 358 F.3d at 1226 (citation and internal quotation marks omitted). Thus, the "government is entitled to more leeway in its investigative methods when it pursues a conspiracy." *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002). Citing the first affidavit, Rodriguez begins by disputing that the government was even investigating a conspiracy and sought to identify unknown individuals in that conspiracy; he asserts that the investigation's true purpose was to "develop information regarding [Rodriguez's] distribution of drugs." From the affidavits, however, it is clear that the government sought a wiretap for Rodriguez's phone to understand his role in a larger extortion and drug conspiracy associated with the Mexican Mafia. The first affidavit, for example, states that the wiretap is necessary to "develop information regarding [Rodriguez's] distribution of drugs" and "to determin[e] whether the Tri-City Hills gang [of which Rodriguez was a member] is collecting and/or paying taxes to various Mexican Mafia associates like similarly situated gangs." Contrary to the particularity argument Rodriguez makes here, "[t]he necessity for the wiretap is evaluated in light of

the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006) (citation and internal quotation marks omitted). Given the "leeway" we give the government when it is investigating a conspiracy, *Canales Gomez*, 358 F.3d at 1226, we may consider general statements about the conspiracy so long as they are specific to the case and are not impermissible boilerplate conclusions about the inherent limitations of a particular investigative technique.

Second, Rodriguez contends that this Court cannot conclude that the affidavits contain a full and complete statement of facts because the affidavits did not include the fact that Rodriguez was subject to a Fourth Amendment search waiver.[2]   As a preliminary matter, we note that Rodriguez has not sufficiently established in the record that the government was aware that Rodriguez was subject to a search waiver when it submitted the wiretap applications to the issuing judge.   Rodriguez simply argues that the government must have been aware of the search waiver because the police conducted a physical search of his residence, pursuant to the waiver, nearly two months after the police submitted the wiretap applications.

---

[2] As previously noted, the record does not contain the exact language of Rodriguez's Fourth Amendment search waiver.  These search waivers are commonly included as a condition for probation and require the individual to subject his person, property, and residence to search and seizure without the standard level of cause. *See United States v. Lara*, 815 F.3d 605, 607 (9th Cir. 2016).  We note, however, that the exact language used in search waivers is not uniform and varies depending on the probation condition.

A search waiver is relevant to the necessity determination under 18 U.S.C. § 2518(1)(c) because the waiver allows law enforcement officers to conduct a more extensive search than a search pursuant to a search warrant, which would be limited in scope and particularity. The government argues, however, that knowledge of the Fourth Amendment search waiver would not have affected the issuing judge's determination here because the affidavit already explained that any searches would have been impractical and largely unproductive. *See United States v. Ippolito*, 774 F.2d 1482, 1485–86 (9th Cir. 1985). This rationale, the government argues, extends to searches pursuant to Fourth Amendment search waivers where the same type of limited evidence would have been discovered. We agree.

In the context of this case, the government sought evidence to identify and prove relationships between certain subjects and determine the extent of the subjects' involvement with the Mexican Mafia. The affidavits explain that this type of evidence is "rarely 'stored' in locations that can be searched or even kept in a tangible form capable of being physically seized." Because it follows that a search conducted pursuant to a Fourth Amendment search waiver would have been similarly unproductive, the omission of the search waiver from the statement of facts does not tip the balance and lead to a conclusion that the affidavits did not include a full and complete statement of facts under 18 U.S.C. § 2518(1)(c) or that the issuing judge abused her discretion in issuing the wiretap orders.[3]

---

[3] Although the search waiver and a potential search warrant are equivalent in terms of necessity for a wiretap application here, that may

## C.  Statutory Requirement of Necessity

As noted, in reviewing a district court's decision on a motion to suppress wiretap evidence, we review de novo whether the application for the wiretap contained "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c); *see Christie*, 825 F.3d at 1066; *Rivera*, 527 F.3d at 898.  The application must include more than "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures."  *Christie*, 825 F.3d at 1068 (citing *Blackmon*, 273 F.3d at 1210).  If the wiretap application meets the requirements of 18 U.S.C. § 2518(1)(c), we then review the decision to authorize the wiretap for abuse of discretion.  *Id.* at 1066.  We review each wiretap independently.  *Gonzalez, Inc.*, 412 F.3d at 1115.

## 1. Whether the Affidavits Contain a Full and Compete Statement of Facts

We first turn to a de novo review of the statements in the wiretap affidavits purporting to show necessity under 18 U.S.C. § 2518(1)(c).  Each affidavit includes information about confidential sources, undercover officers, physical surveillance, stationary surveillance, pen registers, toll analysis, grand jury subpoenas, trash searches, search warrants, interviews with associates, mail covers, and vehicle tracking devices.  The second affidavit is not an impermissible "carbon copy" of the first, *Blackmon*, 273

---

not always be the case.  Here, law enforcement officers sought evidence that would likely not be produced from a search pursuant to a search warrant or a search waiver.

F.3d at 1208, because it explains the developments in the case since the authorization of the first wiretap and the need for new wiretaps on phone numbers listed to Carrie Brown-Rodriguez.  Specifically, law enforcement officers sought a wiretap for phone numbers associated with Rodriguez's wife because Rodriguez was no longer using the phone that was wiretapped as a result of the first wiretap authorization.

The affidavits contain some boilerplate conclusions as to the effectiveness of certain techniques, particularly regarding pen registers, pole cameras, grand jury subpoenas, search warrants, and interviews with associates and targets. For example, the second affidavit explains that search warrants would be unproductive because the "execution of such search warrants would likely cause certain Target Subjects to cease use of their respective telephones and take additional steps to conceal their activities."  Some boilerplate language, however, is not fatal as we evaluate "'the level of detail in the affidavit *as a whole*,' rather than piecemeal." *Christie*, 825 F.3d at 1068 (quoting *Rivera*, 527 F.3d at 899) (emphasis in original).

Each affidavit includes information on why a particular technique would not be effective in this particular investigation.  Both affidavits explain that the effectiveness of undercover agents, confidential sources, interviews, and grand jury subpoenas is limited due to the extreme violence that the Mexican Mafia uses in its everyday operation.  The first affidavit notes that the Mexican Mafia "ruthlessly punishes law enforcement cooperators," and the organization's reputation "has caused and will continue to cause potential cooperators . . . to resist recruitment by law enforcement."  As noted above, Rodriguez asserts that these explanations cannot be used to show necessity as to him.  In *United States v. McGuire*, however, we accepted an affidavit

with similar explanations regarding a "close-knit" group with a "known violent propensity." 307 F.3d at 1197. Here, it is logical to conclude that these statements may extend to Rodriguez as a gang member allegedly associated with the Mexican Mafia.

In regard to undercover agents, both affidavits explain that the insular and violent nature of the Mexican Mafia and its associated street gangs would make the insertion of an undercover agent into this investigation unproductive or too dangerous. The first affidavit notes that it would not be possible to create an undercover identity "that includes serving time in prison, because, any claim of prison time would be rapidly disproved by the Mexican Mafia's inmate network." Both affidavits note that the Mexican Mafia relies on its 200 members and street gang members who "are from the same neighborhoods and often grow up together." The Mexican Mafia members and its associated street gangs rely on close connections of individuals they already know, which sufficiently explains why the use of undercover agents would not be a successful investigative technique. Although Rodriguez asserts that these statements offer no information on why the government could not use an undercover agent in the investigation of him, as we noted above, it is fair to infer that these statements are relevant to Rodriguez, among others, because the government was investigating his association with the Mexican Mafia.

With respect to stationary surveillance, the first affidavit explains that pole cameras would not be productive because Rodriguez lives in a community apartment building. Rodriguez argues that this "blanket assertion" that the value of stationary surveillance would be limited because Rodriguez lived in an apartment building is insufficient. We disagree. Rodriguez incorrectly states that the first affidavit

includes no information about the "layout of the apartment building that would make stationary surveillance impractical." The first affidavit notes that pole cameras could not be installed in any location that could observe Rodriguez's apartment, and that agents therefore would be unable to differentiate individuals visiting Rodriguez from those who are "visiting or returning to other apartments in the building." The second affidavit explains that agents placed pole cameras outside two residences associated with Rodriguez and Brown-Rodriguez other than the apartment listed in the first affidavit. The affidavit states that while these cameras would be helpful to see if any of the target subjects visit those residences, they would provide no information about the substance of any communications between target subjects regarding criminal activity.

Rodriguez also contends that because law enforcement officers did not attempt trash searches, the government has not established necessity. We, however, do not require law enforcement officers to "exhaust every conceivable alternative before obtaining a wiretap." *Christie*, 825 F.3d at 1068 (citing *Rivera*, 527 F.3d at 903). The affidavit need only explain why a particular investigative procedure reasonably appears "unlikely to succeed." 18 U.S.C. § 2518(1)(c). The first affidavit adequately explains that trash searches would be unproductive because Rodriguez lives in an apartment building, and law enforcement officers would not be able to separate his trash from the trash of other residents. Similarly, the second affidavit states that trash searches would be unlikely to produce the kinds of evidence sought in this investigation, such as "the disposition of tax proceeds collected from gang members," "the manner and timing of the importation of narcotics," and "the location of additional stash houses."

According to Rodriguez, the first affidavit also insufficiently explains the need for a wiretap in light of the success in the investigation through a confidential source ("CS-1"). The first affidavit shows that CS-1 was successful in providing the government with information on Rodriguez and other subjects through controlled buys during the first two months of the investigation. We, however, have acknowledged that "the mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000). The first affidavit also explains that the evidence that CS-1 could provide was limited because he could not inquire about Rodriguez's relationship to other subjects "without raising suspicion," and perhaps putting himself at great risk. *See Canales Gomez*, 358 F.3d at 1226 (quoting *United States v. Bernal-Obseo*, 989 F.2d 331, 333 (9th Cir. 1993)) ("[T]he use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril.").

The second affidavit states that CS-1 is no longer an available source because he was involved in unsanctioned illegal activity. These explanations do not explicitly "recite the inherent limitations of using confidential informants" but explain "in reasonable detail why each confidential source . . . was unable or unlikely to succeed in achieving the goals of the [particular] investigation." *See Rivera*, 527 F.3d at 899. They are more than sufficient.

Based on a de novo review of both affidavits, we conclude that they adequately explained why the interception of wire communications was necessary to investigate this conspiracy and the target subjects, and that they contained a full and complete statement of facts to

establish necessity under 18 U.S.C. § 2518(1)(c). *See Canales Gomez*, 358 F.3d at 1225.

## 2. Whether the Wiretaps Were Necessary

We turn next to the question of whether the issuing judge appropriately determined "on the basis of the facts submitted by the applicant [in the affidavits] that . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). As we have said, we review for an abuse of discretion the issuing judge's decision to issue the wiretap order once she has found that the wiretap was necessary in the circumstances. *Lynch*, 437 F.3d at 912; *Canales Gomez*, 358 F.3d at 1225.

In undertaking this review, we use "a 'common sense approach' to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success." *Christie*, 825 F.3d at 1068 (quoting *Gonzalez, Inc.*, 412 F.3d at 1112). Rodriguez argues that individual subjects were not surveilled long enough to justify a finding of necessity for the wiretaps. The government applied for the first wiretap after two and a half months of investigation. We have never stated a minimum number of days of investigation required before the government may apply for a wiretap authorization, but the length of the investigation is a factor in the analysis. Given the wide range of traditional techniques used in the first two months of investigation, it does not appear in this case that the government sought "'to use the wiretap as the initial step' in its investigation." *Christie*, 825 F.3d at 1068 (citing *Rivera*, 527 F.3d at 902).

We have always accorded the issuing judge "considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy," *Reed*, 575 F.3d at 909, so our standard of review is deferential, *McGuire*, 307 F.3d at 1197. The affidavits here show that the government used a range of traditional techniques including confidential sources, pen registers, physical surveillance, and grand jury subpoenas before seeking authorization for electronic surveillance. The affidavits also explain why other techniques such as search warrants, undercover agents, trash searches, stationary surveillance, and interviews with witnesses would be unproductive or dangerous given specific facts about the Mexican Mafia and the particular case. In this case, law enforcement officers specifically sought to gain evidence and knowledge of how the Mexican Mafia and associated gangs were operating through extortion and drug trafficking. In addition, we have "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." *Rivera*, 527 F.3d at 902 (citing *McGuire*, 307 F.3d at 1198).

After reviewing the factual statements in the affidavits, which include the purpose of the investigation and the information sought, we cannot say that the issuing judge abused her discretion in finding necessity in the circumstances presented here.

## III.  SENTENCING ISSUES

### A.  Sentencing Enhancement under 21 U.S.C. § 851

Rodriguez makes two arguments to attack his sentence enhancement under 21 U.S.C. § 851. First, he contends that

the statutory scheme under § 851 violates Rodriguez's Sixth Amendment right to a jury trial. Second, he argues that the district court erred in applying the sentencing enhancement because the government failed to prove his identity in the three prior convictions that were the basis for the enhancement.

Rodriguez's first argument lacks merit. Relying on *Alleyne v. United States*, Rodriguez argues that the sentence enhancement scheme under § 851, which increases an individual's mandatory minimum sentence, violates the Sixth Amendment because "facts that increase mandatory minimum sentences must be submitted to the jury." 133 S. Ct. 2151, 2163 (2013). The Supreme Court in *Almendarez-Torres v. United States* held that the fact of a prior conviction used to enhance a sentence is a sentencing factor and not an element of the offense that must be decided by a jury. 523 U.S. 224, 247 (1998). We have "repeatedly held . . . that *Almendarez-Torres* is binding unless it is expressly overruled by the Supreme Court." *United States v. Leyva-Martinez*, 632 F.3d 568, 569 (9th Cir. 2011); *see also United States v. Vallejos*, 742 F.3d 902, 906 (9th Cir. 2014). We therefore conclude that the district court's application of § 851 to enhance Rodriguez's sentence did not violate his Sixth Amendment rights.

Rodriguez's second argument requires fuller discussion. A grand jury indicted Rodriguez for violating 21 U.S.C. § 841(a)(1). Section 841 allows the government to seek increased penalties if the individual commits the violation after a prior felony drug conviction has become final. 21 U.S.C. § 841(b)(1)(A)(viii). Pursuant to the procedures set forth in § 851, the government filed an information seeking enhanced penalties to increase Rodriguez's potential mandatory minimum from 10 years to 20 years. § 851(a).

Rodriguez filed a written response challenging the prior convictions on the grounds that (1) the statutory scheme under 21 U.S.C. § 851 is unconstitutional, and (2) two of the three prior convictions were not controlled-substance offenses that could serve as a basis for the enhancement — an issue he does not raise on appeal.

At a hearing before sentencing, the government presented certified copies of three prior convictions to support the sentence enhancement under § 851. After the prosecution finished presenting its evidence of the prior convictions, Rodriguez's counsel raised a new argument that there was "[n]othing to show that [his] client is the individual who is listed here as Robert Rodriguez in these documents." In other words, he argued that the government failed to prove with sufficient evidence that he was the "Robert Rodriguez" named in the convictions. After the government noted that this argument was not included in Rodriguez's written response, the district court asked defense counsel if "as an officer of the court" he had "a good faith belief that these [were] not [his] client's convictions." Defense counsel responded that he would prefer not to answer unless ordered to do so by the court. After the district court ordered him to respond, defense counsel said, "I believe these are my client's convictions." Significantly, the district court made no such inquiry personally of Rodriguez. After further discussion, the district court concluded that the certified copies of the convictions proffered by the government were "reasonably reliable information that these are convictions suffered by the defendant," and that the government had met its burden of proving the prior convictions under § 851.

To seek an enhanced penalty, the government must file, before trial or before the entry of a plea, a written information stating "the previous convictions to be relied

upon." 21 U.S.C. § 851(a)(1). The government did so in this case. At some point before the sentence is imposed, the district court must address the defendant personally and (1) "inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information," and (2) "inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." § 851(b). If a defendant "denies any allegation of the information" or "claims that any conviction alleged is invalid," he must file a written response, which triggers a hearing "to determine any issues raised by the response." § 851(c)(1). At the hearing, the government has the burden of proof beyond a reasonable doubt on any disputed issue of fact. *Id*. "Any challenge to a prior conviction, not raised by response to the information" is waived unless the person can show "good cause" for a failure to make a timely challenge. § 851(c)(2).

We require "strict compliance with the procedural aspects of section 851(b)." *United States v. Hamilton*, 208 F.3d 1165, 1168 (9th Cir. 2000). The § 851(b) colloquy is not merely a procedural requirement. It serves a functional purpose "to place the procedural onus on the district court to ensure defendants are fully aware of their rights." *United States v. Espinal*, 634 F.3d 655, 665 (2d Cir. 2011) (quoting *United States v. Baugham*, 613 F.3d 291, 296 (D.C. Cir. 2010)). In this case, the district court "did not follow these procedures meticulously." *Id*. at 662. It did not ask Rodriguez if he affirmed or denied the prior convictions nor did it inform him that he had to raise any challenge to a prior conviction before the sentence was imposed. The district court thus failed to comply with § 851(b).

"The general rule is clear that failure to comply with section 851(b) renders the sentence illegal." *United States v. Housley*, 907 F.2d 920, 921 (9th Cir. 1990) (citation and internal quotation marks omitted). But "non-prejudicial errors in complying with the procedural requirements of § 851" do not automatically require reversal; they sometimes may be harmless. *Espinal*, 634 F.3d at 665; *see also United States v. Severino*, 316 F.3d 939, 948 (9th Cir. 2003) (en banc) (concluding that the district court's failure to give a § 851(b) colloquy was not plain error where the defendant "had no way to challenge the validity of the prior conviction"); *Housley*, 907 F.2d at 921 (concluding that the district court's failure to give a § 851(b) colloquy was harmless where the defendant was barred from challenging the validity of the convictions due to § 851(e)). In this case, however, a combination of factors — the detailed procedures required by § 851, the district court's failure to comply strictly with § 851 and the resulting confusion, the lack of clarity in the court's ruling, and the serious impact that the 20-year statutory mandatory minimum had on the sentence imposed — lead us to conclude that the error here was not harmless.

The § 851(b) colloquy notifies the defendant that he must include all challenges to his prior convictions in the written response, or he forever waives such challenges. § 851(b). Rodriguez filed a written response, but he did not explicitly deny the convictions or argue that he was not the individual listed in the exhibits attached to the government's information. It appears that Rodriguez or his attorney made a tactical choice not to include his identity challenge in the written response, and instead raised it orally only after the government had concluded its presentation. We do not condone attempts to surprise opposing counsel with an argument that was not raised in submitted papers, and

Rodriguez's choice certainly added to the confusion at the proceeding. Nevertheless, under the statute, Rodriguez was not required to affirm or deny the convictions or file a written response until addressed personally by the district court and advised of his obligation to do so and — importantly — that any failure to do so waived any objections. *Espinal*, 634 F.3d at 663–65. That Rodriguez ultimately did file a written response does not negate the importance of a proper advisal.

In addition to the impact on a defendant, when the court fails to follow the procedures in § 851(b), the government does not have a fair opportunity to present its best arguments and evidence. *See id*. at 666. The procedures in the statute anticipate that the § 851(b) colloquy and the defendant's written denial of the convictions or any allegation in the information will occur before the government must produce further evidence at the hearing. Although the government has the burden of proving disputed facts at the hearing beyond a reasonable doubt, "that burden is triggered only where the defendant denies the prior felony and submits a written response raising a [disputed] factual issue." *Id*. at 664 (citing 21 U.S.C. § 851(c)).

Two additional procedural defects warrant remand in this case. First, the district court appears to have been uncertain of its responsibilities under § 851 as the sentencing hearing unfolded. At one point in the proceeding, the court noted that the presentence investigation report set out Rodriguez's prior convictions, but then conflated Rodriguez's failure to object to the convictions set forth in the report with his separate identity challenge. The district court also asked "how else would we prove" these convictions and later questioned whether § 851 required testimony from individuals and whether a jury was required. Section 851 explicitly answers these questions. If the

defendant denies any allegation in the information and files a written response, a "hearing shall be [held] before the court without a jury and either party may introduce evidence." § 851(c)(1).    Furthermore, a district court may find as a matter of fact any *undisputed* portion of a presentence investigation report under Rule 32 of the Federal Rules of Criminal Procedure, but that is not the same as the requirement that the government prove beyond a reasonable doubt a *disputed* fact, including a prior conviction under § 851. *See* Fed. R. Crim. P. 32(i)(3)(A).**[4]**

Second, it is unclear from the record whether the district court used the appropriate standard when it ultimately ruled on the merits of the § 851 issues and concluded that Rodriguez was subject to a 20-year statutory mandatory minimum.    Initially, the district court characterized its inquiry as whether the documents provided by the government were "reasonably reliable information."    After further discussion with the parties, the court then stated:

> I have reasonably reliable information that these are convictions suffered by the defendant, Mr. Rodriguez. . . . Proof beyond a reasonable doubt does not require proof beyond all doubt.    It is proof using common

---

**[4]** Although 21 U.S.C. § 851 does not state precisely when the district court must engage in the § 851(b) colloquy, it "seem[s] preferable not to postpone the inquiry until the scheduled sentencing date" to avoid the kind of confusion that occurred in this case.    *Espinal*, 634 F.3d at 662. The district court may, however, hold the proceeding required by § 851(c) immediately before sentencing; it need not hold a separate hearing on a different day.    *See Housley*, 907 F.2d at 921.

> sense that, in fact, these are Mr. Rodriguez's convictions. . . . I'm satisfied that, in fact, the government has proved that these are the defendant's prior convictions. So that is my ruling.

From these statements, it is unclear whether the district court applied the required proof beyond a reasonable doubt standard or a lesser "reasonable reliability" standard.[5]

The procedures detailed in § 851 are intended to provide clarity to all parties before a judge imposes a lengthy mandatory minimum sentence that substantially affects a defendant. As the Second Circuit has noted, "[c]onsidering that a ten-year sentencing enhancement turns on the outcome of the § 851 procedure, the failure to comply fully with the statute's procedural requirements should not casually be deemed harmless error." *Espinal*, 634 F.3d at 667. Given the procedural defects here — and despite the fact that Rodriguez's counsel caused some of the confusion, *see id*. at 663 — we cannot say the error in this case was harmless. We therefore vacate Rodriguez's sentence and remand for resentencing.

## B. Guidelines Sentencing Adjustments Under §§ 3B1.1 and 3E1.1

Although we vacate Rodriguez's sentence for the district court's failure to comply with 21 U.S.C. § 851(b), we

---

[5] We decline to state whether the certified copies of conviction offered by the government proved beyond a reasonable doubt that Rodriguez suffered these convictions, although this was not a case in which the government produced unverified or incomplete records as proof of prior convictions. *See Espinal*, 634 F.3d at 660, 663.

address Rodriguez's other sentencing guidelines arguments because these issues are likely to arise again at resentencing.

When calculating Rodriguez's guidelines sentencing range, the district court applied a four-level upward adjustment under U.S.S.G. § 3B1.1(a) after finding that Rodriguez was a leader of a criminal activity. The district court also denied Rodriguez's request for a two-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Rodriguez first argues that a factual determination by a judge that Rodriguez was a leader of a criminal activity violates the Sixth Amendment, and that under *Alleyne*, such a fact must be proven to a jury beyond a reasonable doubt. 133 S. Ct. at 2151. Second, he maintains that the district court erred by denying a downward adjustment for acceptance of responsibility.

Under U.S.S.G. § 3B1.1(a), a district court may increase the base offense level by four levels if the court finds that the "defendant was an organizer or leader of a criminal activity that involved five or more participants." In *United States v. Vallejos*, we concluded that if an offense level increase under the U.S. Sentencing Guidelines does not affect the statutory maximum sentence or the mandatory minimum sentence, "neither *Apprendi* nor *Alleyne v. United States* is implicated." 742 F.3d at 906 (citing *Alleyne*, 133 S. Ct. at 2163). The organizer/leader adjustment did not affect the statutory maximum or mandatory minimum of Rodriguez's sentence, and therefore neither *Alleyne* nor *Apprendi* require a jury to find that Rodriguez was an organizer or leader of a criminal activity. *Id*. The district court did not violate Rodriguez's constitutional rights by applying an upward adjustment under U.S.S.G. § 3B1.1(a) without submitting the issue to a jury.

The Sentencing Guidelines allow a two-level downward adjustment to an individual's base offense level "if the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "A district court's decision about whether a defendant has accepted responsibility is a factual determination reviewed for clear error." *United States v. Doe*, 778 F.3d 814, 821 (9th Cir. 2015) (quoting *United States v. Rosas*, 615 F.3d 1058, 1066 (9th Cir. 2010)). "The determination of the sentencing judge is entitled to great deference on review because of the sentencing judge's unique position to evaluate a defendant's acceptance of responsibility." *United States v. Nielsen*, 371 F.3d 574, 582 (9th Cir. 2004) (citation and internal quotation marks omitted). The defendant bears the burden of demonstrating acceptance of responsibility, *United States v. Osinger*, 753 F.3d 939, 948 (9th Cir. 2014), and must show "genuine contrition for his acts," *United States v. Dhingra*, 371 F.3d 557, 568 (9th Cir. 2004). We conclude that the district court did not clearly err in denying the adjustment.

The Sentencing Guidelines note that a downward adjustment for acceptance of responsibility generally is not intended to apply to a defendant, like Rodriguez, "who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt. 2. But "in appropriate circumstances the [adjustment] is also available in cases in which the defendant manifests genuine contrition for his acts but nonetheless contests his factual guilt at trial." *United States v. Cantrell*, 433 F.3d 1269, 1285 (9th Cir. 2006) (quoting *United States v. McKinney*, 15 F.3d 849, 853 (9th Cir. 1994)).

In his presentence interview, Rodriguez expressed his regret for involving himself in illegal activity, and he said

how difficult his incarceration had been on his family. Rodriguez stated that he went to trial because he was not made a reasonable plea offer and therefore had no other choice but to go to trial. Rodriguez chose not to speak at sentencing and provided no other statements that demonstrated that he had accepted responsibility for his actions. Although Rodriguez expressed some regret for his actions to the probation officer, these statements do not necessarily indicate that he showed genuine contrition for his actions, or that the district court clearly erred in denying a downward adjustment for acceptance of responsibility. *See United States v. Martinez-Martinez*, 369 F.3d 1076, 1090 (9th Cir. 2004).

## C.  Substantive Reasonableness of Rodriguez's Sentence

Rodriguez's sentence of 600 months — or 50 years — may be unduly harsh, and we might reasonably question whether it was "greater than necessary" to further the purposes of the sentencing statute. 18 U.S.C. § 3553(a); *see United States v. Crowe*, 563 F.3d 969, 978 (9th Cir. 2009); *United States v. Cherer*, 513 F.3d 1150, 1159 (9th Cir. 2008). Although Rodriguez had an extensive criminal history, his sentence is longer than those for many violent crimes. Ultimately, we need not reach Rodriguez's substantive unreasonableness claim because, for the reasons previously discussed, we vacate the sentence and remand for resentencing.

The judgment of conviction is **AFFIRMED**. The sentence is **VACATED**, and we **REMAND** for resentencing.